STATE OF IOWA, Appellee, v. HARRY TAYLOR, Appellant.

CRIMINAL LAW: Suspicion Only. No verdict of guilt will be permitted to rest solely on a conjecture of guilt.

*Appeal from Wapello District Court.*—F. M. HUNTER,
Judge.

DECEMBER 14, 1918.

THE defendant, having been convicted upon a charge
of stealing chickens, and sentenced to imprisonment in the
penitentiary, appeals. The material facts are stated in the
opinion.—*Reversed.*

*W. W. Epps,* for appellant.

*H. M. Havner,* Attorney General, and *F. C. Davidson,*
Assistant Attorney General, for appellee.

WEAVER, J.—Mrs. Hattie Hill is a resident of Ottumwa,
and, at the date of the alleged larceny, was the fortunate
owner of four chickens—three "Rhode Island Reds" and
one "Plymouth Rock." Across the street is a house where
the appellant, a native American citizen of African descent,
makes his home, when allowed by his wife, of whom the ac-
cused says in evidence: "Jessie is larger than I am; she is
the best man of the two." On another street, bearing the
title "Smoky Row," not far away, lives the family of one
Clutter, acquaintances and friends of appellant and his wife.
On the night of November 28, 1917,—at what hour there is
no evidence,—the four chickens belonging to Mrs. Hill dis-
appeared, or at least were not in their accustomed place in
the morning. The police being notified of the event, a plain
clothes man made a circuit of investigation through the
neighborhood. About ten o'clock in the forenoon, the police-
man went to Clutter's place, where he saw the defendant's
wife, engaged in cleaning four headless chickens. The of-
ficer was evidently a connoisseur in chickens; for, though
one was already dressed, and the others at some interme-
diate stage of the cleansing process, he identified them as
three Rhode Island Reds and one Plymouth Rock. Mrs.
Taylor and the chickens were in Clutter's kitchen. The de-

fendant was not there; but the officer saw him in bed in the adjoining room, but did not disturb him at that time. Being asked where she got the chickens, Mrs. Taylor "named somebody, or tried to describe him." In this connection, the officer also says:

"I found a fellow there by the name of Burns, a white fellow, a fellow that has the habit of coming to town and tanking up and hanging around some of those places. She didn't say it was him."

Elsewhere, he says she told him she got the chickens from Burns. Later, after visiting the Hill home and inspecting the bodiless heads of four chickens there found, the officer, Mr. Grey, returned to Clutter's, where defendant was still in bed, and arrested him. Grey further testifies that, in the discharge of his duties, he was a somewhat frequent caller at this place; that Mrs. Taylor (who, as will appear, had been for some time separated from her husband, the defendant) had been staying there; but that this was the first time he had seen the defendant there. When arrested, the defendant had one arm in bandages, a circumstance of some importance in the history of this case. Grey further swears that, on one of the trips to the Clutter neighborhood, he found an empty grip "in the first house below," which item of property he took into his possession, and introduced in evidence. The State produced a witness who testified that, on the night before the arrest, he met defendant on the street, some distance west of Mrs. Hill's, and saw he was carrying a "traveling case;" and that the grip produced by the State "looks like it."

The foregoing is the entire sum and substance of the State's case. Just how the "grip" referred to is thought to cut a material figure in the case, is not very apparent. It is not shown to have belonged to the defendant. It was not found in his possession, but "in the first house below." There is no showing that it exhibited blood-marks or feathers

of the Rhode Island Red or Plymouth Rock variety, or that
chickens of any kind or description had ever been packed or
carried in it.   Indeed, there is not the slightest proved
fact connecting this item of evidence with defendant, except
the far-fetched inference drawn from the evidence of the
witness, who says no more than that he met defendant in
the street, in the darkness of night, and saw in his hand
a grip which looked like the one in court; and the still
farther-fetched inference that, because it would be possible
to pack four dead chickens in such a conveyor, the chickens
stolen from Mrs. Hill must have been hidden therein.

The story of the defendant, in which, for the most part,
he appears to have been fairly well corroborated, is that he
and his wife quarreled and separated, some considerable
time before the alleged larceny, and that, after leaving him,
she took up her home at Clutter's.   Defendant was employ-
ed as a porter in a barber shop, and, on the evening before
his arrest, his wife called him by phone, and asked him to
come to Clutter's for an interview looking to an adjustment
of their differences.   He answered the call, with the result
that a fresh quarrel ensued, and Jessie undertook to make
the desired adjustment by the vigorous use of an iron
poker.   She struck defendant with her weapon across the
upper arm, inflicting a painful bruise.   A physician was
called, who treated the injury and dressed the arm in splints
and bandages.   The physician testifies that he has no doubt
of the genuineness of the injury; that it must have been
very painful; and that the muscles of the arm were badly
bruised.   The defendant denies that he was out of the house
that night, or had any part in stealing the chickens, if any
were stolen.   He also swears that he never owned or had
possession of the grip put in evidence, and never saw it
until it was produced on the trial; and that his only knowl-
edge of the chickens is the information given him by his
wife, that she got them from the man Burns,—who, as we

have already seen, the policeman describes as a worthless "white fellow," who "tanks up," and hangs around such places. The defendant shows that he has been a resident of Ottumwa 14 years, an industrious laborer in various employments; and his good character as an honest man is sustained by the testimony of numerous witnesses, against which the State makes no counter showing.

The testimony falls far short of that conclusive character which will fairly sustain a conviction of crime. Every word of evidence on the part of the State may be accepted as the literal and exact truth, and it justifies no inference or finding that defendant stole the chickens in question. That the stolen property was found in the possession of his wife, with whom he was not living, and in a house of which he was not the owner or proprietor, and in a room which he neither occupied nor controlled, raises no presumption of guilt on his part, and casts on him no burden or necessity to explain the presence of the chickens in that house, or the manner in which his wife came into their possession. While it is not for this court to say that a law which makes it possible to punish the theft of a chicken with a long-term imprisonment in the penitentiary is too drastic, yet the serious results which follow upon a conviction ought to lead both court and prosecutor to the exercise of care that, before the accused is made to suffer such a penalty, the case against him shall be established by evidence sufficient to satisfy the just and impartial mind beyond a reasonable doubt. That such a case is not shown by this record, we are abidingly satisfied.

Indeed, the State presses its argument for an affirmance with a hesitant hand, and frankly admits that "there is no presumption of law against a colored defendant from finding stolen chickens in his wife's possession on Thanksgiving morning," but adds that "a situation of this kind has been known to raise something more than a suspicion in

the minds of those who are acquainted with the proclivities of such people." In other words, while conceding that no presumption of law arises against the accused on account of the color of his skin, it is nevertheless suggested that there is a presumption of fact which may justify the verdict. This appeal to popular prejudice to justify a conviction of crime, without substantial competent evidence, we are quite sure would not have been made by the great State of Iowa, had it been able to find any better reason in the record. There may be a popular impression that an unguarded chicken offers peculiarly strong temptation to a man of color; it is an equally popular impression that a chicken well cooked in any style appeals with very strong inducement to men in holy orders, without regard to color; but we trust the point is not yet reached when the mere fact that a colored porter or lily-white minister of the gospel is seen upon the street at night with a suit case in his hand, is judicially held sufficient to convict him of being a chicken thief, even though it should appear that, on the selfsame night, some evil-minded person had burglarized a poultry coop somewhere in the city.

The judgment of conviction will be reversed and cause remanded, with recommendation that, unless other competent evidence is obtainable, the prosecution be dismissed. —*Reversed.*

PRESTON, C. J., GAYNOR and STEVENS, JJ., concur.